E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
NISHA CHANDRAN (Cal. Bar No. 325345)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2429
    Facsimile: (213) 894-0141
    E-mail:   nisha.chandran@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-CR-00580-ODW-2 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT SARAH TAYLOR BROWN |
| v. | |
| SARAH TAYLOR BROWN, | Sentencing |
| Defendant. | Hearing Date: January 23, 2023<br>Hearing Time: 1:30 p.m.<br>Location: Courtroom of the Honorable Otis D. Wright, II |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Nisha Chandran, hereby files its sentencing position for defendant SARAH TAYLOR BROWN.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the United States Probation and Pretrial Services Office's presentence investigation report, and such further evidence and argument as the

Court may permit.

The government respectfully requests the opportunity to supplement its position or otherwise respond to defendant as may become necessary.

Dated: January 17, 2023         Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


       /s/
NISHA CHANDRAN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

**Contents**

MEMORANDUM OF POINTS AND AUTHORITIES..................................3

I.   INTRODUCTION.....................................................3

II.  STATEMENT OF FACTS...............................................4

III. THE USPPO'S CALCULATIONS.........................................6

IV.  THE COURT SHOULD HOLD DEFENDANT LIABLE FOR THE REASONABLY
     FORSEEABLE LOSSES THAT HER CO-CONSPIRATORS CAUSED IN
     FURTHERANCE OF THE SCHEME........................................6

     A.  Relevant Legal Standard.....................................7

     B.  If the Court Does Not Find Defendant Liable for the
         Conspiracy's Loss Amount, The Court Should Find
         Defendant Liable for the Total Loss Attributable to
         Her and Co-Defendant Mateer's Conduct......................12

     C.  Defendant's Proposed Loss Amount Is Underinclusive And
         Contrary To The Law........................................14

V.   A TWO-LEVEL ENHANCEMENT IS APPLICABLE BECAUSE THE OFFENSE
     INVOLVED TEN OR MORE VICTIMS....................................15

VI.  THE GOVERNMENT RECOMMENDEDS A LOW-END GUIDELINES SENTENCE
     OF 24 MONTHS' IMPRISONMENT......................................15

     A.  The Nature and Circumstances of the Offense and
         History and Characteristics of Defendant Warrant a
         Low-End Guidelines Sentence................................16

     B.  A Low-End Guidelines Sentence Reflects the Seriousness
         of the Offense, Promotes Respect for the Law, Provides
         Just Punishment, Affords Adequate Deterrence, and
         Protects the Public........................................17

     C.  A Low-End Guidelines Sentence Avoids Unwarranted
         Disparities................................................17

VII. CONCLUSION......................................................18

**TABLE OF AUTHORITIES**

**CASES**

Gall v. United States,
    552 U.S. 38 (2007)..........................................17

United States v. Escalante,
    637 F.2d 1197 (9th Cir. 1980)................................7

United States v. Kearney,
    560 F.2d 1358 (9th Cir. 1977)................................7

United States v. Treadwell,
    593 F.3d 990 (9th Cir. 2010).................................8

**STATUTES**

18 U.S.C. § 3553..........................................15, 17

**OTHER AUTHORITIES**

Ninth Circuit Model Jury Instructions 11.4 Conspiracy –
    Knowledge of and Association with Other Conspirators...........7

U.S.S.G. § 1B1.3............................................7, 8, 9

U.S.S.G. § 2B1.1..........................................8, 11, 13

U.S.S.G. § 5A..................................................18

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Beginning no later than August 2020 to at least October 2020, defendant SARAH TAYLOR BROWN ("defendant") participated in a scheme to fraudulently obtain unemployment benefits that the California's Employment Development Department ("EDD") issued to other people. In December 2022, defendant pleaded guilty in a plea agreement to violating count one, which charges unauthorized use of access devices, in violation of 18 U.S.C. § 1029(a)(2). (CR 82 ("Plea Agreement") and 84.)

The Court ordered the United States Probation and Presentence Office ("USPPO") to prepare a limited presentence report addressing defendant's criminal history only. (CR 84).[1] The USPPO issued its Modified Presentence Report ("PSR") on December 27, 2022 (CR 85, PSR), and calculated a criminal history category of I (PSR ¶¶ 15, 26).

As the PSR highlighted, the parties disagree about the applicable loss amount, and, as a result, the applicable Guidelines range. Defendant argues that the applicable loss in this case should be $54,740, which is limited to those losses for which defendant is captured on ATM surveillance photographs. The government disagrees. For the reasons discussed below, the government believes that the applicable loss in this case should be the full loss attributable to the scheme based on defendant's co-conspirators' reasonably foreseeable actions in furtherance of the conspiracy, which the

---

[1] Defendant has been in custody since June 14, 2021. Defendant accordingly requested a limited presentence report to prevent over-serving her sentence in pre-trial custody.

parties agree is $478,280.69. Based on a loss amount of $478,280.69, defendant's total offense level is 17, yielding an advisory Guidelines range of 24-30 months.

Pursuant to the sentencing factors articulated in 18 U.S.C. § 3553, and consistent with its obligations in the plea agreement, the government recommends a low-end Guidelines sentence of 24 months' imprisonment, followed by a three-year term of supervised release, a $100 special assessment, and restitution in the amount of $478,280.69.

## II. STATEMENT OF FACTS

Defendant admitted to the following facts at her change of plea hearing and in the plea agreement (PSR ¶¶ 8-11; Plea Agreement ¶ 11):

On October 1, 2020, in Los Angeles County, within the Central District of California, law enforcement stopped defendant and co-defendant Robert Sloan Mateer for a traffic violation in co-defendant's car, and law enforcement searched the car. Law enforcement found, among other things: (1) two cell phones with debit and credit cards in names belonging to persons other than defendant and co-defendant Mateer; (2) 17 State of California Employment Development Department ("EDD") cards embossed with various names belonging to persons other than defendant and co-defendant Mateer; (3) five credit and debit cards in names other than defendant or co-defendant Mateer; and (4) approximately $197,711.79 in cash. (PSR ¶ 8; Plea Agreement ¶ 11.)

EDD debit cards like the cards found in co-defendant Mateer's car are linked to bank accounts that contain money intended for individuals who qualify for unemployment or other state benefits that the EDD administers. (Plea Agreement ¶ 11.) Co-defendant Mateer

4

fraudulently obtained EDD debit cards by applying for EDD benefits using another individual's personal identifying information on the EDD website. (PSR ¶ 10; Plea Agreement ¶ 11.) On the website, co-defendant Mateer would direct the EDD debit card to be sent to an address that did not belong to the individual whose identity he was using. (Id.) Defendant, co-defendant, and others would then retrieve the EDD card from the address that co-defendant Mateer designated and would use the card at an ATM machine to withdraw EDD cash benefits. (Id.)

In furtherance of this scheme, defendant knowingly and with the intent to defraud, used debit card account numbers issued to persons other than defendant and co-defendant Mateer to fraudulently obtain money from the EDD program. (Plea Agreement ¶ 11.) For example, beginning no later than August 2020, and continuing until at least October 2020, in Los Angeles County, defendant used: (1) a Bank of America account number ending in 9089 issued to victim B.S. to obtain $1,000 of EDD benefits; and (2) a Bank of America account number ending in 5119 issued to victim G.T. to obtain $1,000 of EDD benefits. (Id.) Defendant is captured on ATM surveillance footage making withdrawals in the amount of at least $54,740. (Id.)

In total, as a result of the EDD fraud scheme, defendant, co-defendant Mateer, and others caused actual losses to the EDD program of at least $478,280.69 from the date defendant joined the scheme. (PSR ¶ 11; Plea Agreement ¶ 11.) Defendant admitted that she or her co-conspirators, whose conduct was reasonably foreseeable to her, caused at least approximately $54,740 in actual losses. (Id.)

**III. THE USPPO'S CALCULATIONS**

In the PSR, the USPPO acknowledged that the parties stipulated in the plea agreement to a total offense level of at least 12, but that the parties disagreed as to the loss amount, and thus, disagreed about the enhancement level that should be applied.  (PSR ¶¶ 24-26.)  Specifically, the USPPO acknowledged that, in the plea agreement, the government reserved the right to argue that the loss amount in this case was more than $250,000, warranting the application of a 12-level increase under the Sentencing Guidelines, whereas defendant reserved the right to object to the application of anything more than a 6-level enhancement for loss under the Sentencing Guidelines.  (PSR ¶ 25.)  The USPPO stated that, if defendant's argued 6-level enhancement were applied, defendant's total offense level would be 12, yielding an advisory Sentencing Guidelines range of 10-16 months.  (PSR ¶ 26.)  The government agrees with the PSR's Criminal History Category calculation.

**IV.   THE COURT SHOULD HOLD DEFENDANT LIABLE FOR THE REASONABLY FORSEEABLE LOSSES THAT HER CO-CONSPIRATORS CAUSED IN FURTHERANCE OF THE SCHEME**

Defendant admitted that the total losses caused by her and her-co-conspirators, whose actions in furtherance of the conspiracy were reasonably foreseeable, caused a loss amount of $478,280.69.  This is the loss amount that the Court should find applies here.

Defendant, however, believes that the appropriate loss amount is $54,740.  This number would limit defendant's loss to only those EDD benefits that were withdrawn when defendant was personally present and where defendant was personally captured on the ATM surveillance camera.  If the Court held defendant liable only for this loss amount

6

it would counter applicable law and fail to hold her accountable for her full participation in the scheme.

Nonetheless, defendant agrees that co-defendant Mateer and other co-conspirators also participated in the EDD fraud. And defendant further agrees, that she, co-defendant Mateer, and others, in total, caused losses to the EDD program of at least $478,280.69 from the date defendant joined the scheme. Because the remaining losses were part of the same criminal conspiracy and those losses were both reasonably foreseeable to defendant, and were in furtherance of the same conspiracy, the government believes that defendant should be liable for the $478,280.69.

**A. Relevant Legal Standard**

Pursuant to the Sentencing Guidelines, relevant conduct that determines the applicable Sentencing Guidelines range includes jointly undertaken criminal activities, or any scheme undertaken by the defendant in concert with others, whether or not that conduct was charged as a conspiracy. U.S.S.G. § 1B1.3. In the case of jointly undertaken criminal activities, all acts and omissions of others that occurred during the commission of the offense are considered so long as those acts and omissions were: (1) within the scope of the jointly undertaken criminal activity; (2) in furtherance of that criminal activity; and (3) reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3(a)(1)(B).[2] These requirements

---

[2] To be convicted of participation in a conspiracy, "it is not necessary that all members of the conspiracy join it at the same time, and one may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the names, identities, or locations of all of the other members." Ninth Circuit Model Jury Instructions 11.4 Conspiracy – Knowledge of and Association with Other Conspirators; see also United States v.
*(footnote cont'd on next page)*

in § 1B1.3(a)(1)(B) operate as a limit on what conduct may be considered to determine the loss estimate attributable to each defendant in conspiracies.  See United States v. Treadwell, 593 F.3d 990, 1003 (9th Cir. 2010), overruled by United States v. Miller, 953 F.3d 1095 (9th Cir. 2020) on other grounds.  The Court "is not required to proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy and to then make an individualized determination whether or not each item was within the scope of the defendant's 'joint undertaking' and was 'reasonably foreseeable to that defendant.'"  Id. at 1002-03.[3]

"Section 1B1.3(a) is a general provision that prescribes the relevant range of conduct a district court should consider when calculating the applicable Guidelines range, and must be interpreted in conjunction with the specific guideline being applied" to the conduct.  Id.  The applicable guideline here, U.S.S.G. § 2B1.1, requires only that a district court "make a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. n.3(C), as limited by the principles of U.S.S.G. § 1B1.3(a)(1)(B).  Here, the Court should find defendant accountable for the full loss of $478,280.69 that she and her co-conspirators caused.

Defendant agrees that, after the date she joined the scheme by making her first withdrawal on August 27, 2020, defendant, co-

---

Escalante, 637 F.2d 1197, 1200 (9th Cir. 1980); United States v. Kearney, 560 F.2d 1358, 1362 (9th Cir. 1977) (explaining that a person may be a member of a conspiracy even though the person does not know all of the purposes of or participants in the conspiracy).

[3] A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant's joining the conspiracy or after the defendant has properly withdrawn from the conspiracy.  United States v. Hopper, 177 F.3d 824, 833 (9th Cir. 1999); U.S.S.G. 1B1.3 cmt. n.3.

8

defendant Mateer, and others caused actual losses to the EDD program of at least $478,280.69.  (PSR ¶ 11; Plea Agreement ¶ 11; see also Granger Decl. Ex E.)  The $478,280.69 in loss should be attributable to defendant because that amount was: (1) within the scope of the jointly undertaken criminal activity; (2) in furtherance of that criminal activity; and (3) reasonably foreseeable in connection with that criminal activity.  See U.S.S.G. § 1B1.3(a)(1)(B).

First, the scope of the criminal activity that defendant agreed to jointly undertake is broad.  Defendant does not dispute that she and co-defendant Mateer, her boyfriend at the time, worked together to fraudulently obtain EDD benefits.  Specifically, co-defendant Mateer would obtain EDD cards, and then defendant, co-defendant Mateer, and other co-conspirators would retrieve the EDD cards from the designated address.  (PSR ¶ 10; Plea Agreement ¶ 11.)  ATM surveillance footage captured defendant working with co-defendant Mateer for 30 withdrawal transactions totaling $29,000.  (See Declaration of Kimberly Granger ("Granger Decl.") at Ex. D., which are examples of still photographs of defendant and co-defendant Mateer at Bank of America ATMs.)

Importantly, defendant and co-defendant Mateer extensively discussed the EDD fraud through text messages.  For example, co-defendant Mateer wrote defendant, "I need your help with drying some cash out of an ATM if you don't mind I'll pay you for every thousand dollars you pull out."  Defendant responded on August 14, 2020, "I totally am down to help you pull out money."  (See Granger Decl. at Ex. B.)  Co-defendant Mateer also told defendant the address where he sent the cards: "462 Prescott St. is the address babe."  At one point, defendant went to the mailbox to help co-defendant Mateer, and

9

updated him, "I checked the mailbox too by the way and still nothing....like are you positive they got sent babe? You said if I wanted to I could so I figured it would be one less thing for you to worry about...I wish I had good news for you tho." (See Granger Decl. Ex. A.) She also informed him when she ran out of money, when she texted him that "I used the last of my edd." (See id.) These messages show that defendant took many steps to further the conspiracy beyond just making withdrawals at the ATM, indeed, she offered to relieve her co-defendant of work by doing it herself. Additionally, defendant's willingness to "pull out money" is evidence that she welcomed her role in the conspiracy. As such, the Court should hold her accountable for the conspiracy's losses that were reasonably foreseeable.

Defendant's agreement to participate in the scheme also included other co-conspirators. After co-defendant Mateer obtained the EDD debit cards and sent them to a designated address, defendant, co-defendant Mateer, and other co-conspirators would retrieve the EDD cards from the designated address to make withdrawals. (PSR ¶ 10; Plea Agreement ¶ 11.) Defendant also personally worked to expand the scope of the scheme and to enlist others to participate in the scheme. For example, in September 2020, she texted an individual saved in her phone as "Ore Nscardy Cat," with a "proposition . . . to make some money . . . some serious money." (See Granger Decl. Ex. C.) She asks him for "profiles," saying that she will pay him for each one. Id. She says she needs "as many as [he] can give [her]" and that she "just need[s] social name and birth." Id. She suggests she needs "2000" profiles and presses him to get the profiles "asap." Id. She explains "Like straight up dude I'm literally driving a

1  Mercedes GL430 and he [co-defendant Mateer] just bought . . . cash .
2  . . a Maserati" and asks why he "[doesn't] want to make literally
3  thousands and thousands and thousands of dollars."  Id.   In other
4  words, defendant is both aware that other co-conspirators are needed
5  for the scheme to work, and she herself is also soliciting additional
6  co-conspirators to grow and sustain the EDD fraud scheme.
7     In light of the broad scope of her agreement to participate in,
8  and grow, the EDD fraud scheme, with co-conspirators including and
9  beyond co-defendant Mateer, the full loss attributable after
10 defendant joined the EDD fraud scheme falls within the scope of her
11 agreement to participate in the jointly undertaken criminal activity.
12    Also, the additional withdrawal transactions, which caused the
13 additional loss amount at issue, were all in furtherance of the EDD
14 fraud scheme and were reasonably foreseeable in connection with the
15 criminal activity.  The higher loss amount to EDD meant that
16 defendant and her co-conspirators were reaping the exact benefits
17 that the scheme was intended to provide them.  There is no evidence
18 that defendant withdrew from the scheme, so the full loss falls
19 within the scope of her agreement and was reasonably foreseeable.[4]

---

[4] Defendant suggests that she should not be liable for conspiracy losses after she was arrested. Def. Mot. at 8. But again, there is no evidence that defendant withdrew from the conspiracy and defendant's arrest, without more, did not automatically withdraw her from the conspiracy. See United States v. Casarez-Sanchez, 489 F. App'x 180, 181 (9th Cir. 2012) (an "unarrested co-conspirator still operating in furtherance of the conspiracy may say and do things which may be introduced against the arrested one if the conspiracy is still in operation . . . . [a] conspiracy is presumed to continue unless there is affirmative evidence of abandonment or withdrawal [even after a defendant's arrest]"); see also United States v. Baldwin, 774 F.3d 711, 734 (11th Cir. 2014) ("Neither arrest nor incarceration automatically triggers withdrawal from a conspiracy . . . . It was foreseeable that the other members of the conspiracy would continue to operate despite
*(footnote cont'd on next page)*

11

Thus, defendant should be liable for the full $478,280.69 attributable to her, co-defendant Mateer, and the other co-conspirators.

Accordingly, the government believes the total offense level calculation is as follows:

```
Base Offense Level:           6    U.S.S.G. § 2B1.1(a)(2)

Loss of
more than $250,000:         +12    U.S.S.G. § 2B1.1(b)(1)(G)

Offense involved 10
or more victims              +2    U.S.S.G. § 2B1.1(b)(2)(A)

Acceptance of
Responsibility:              -3    U.S.S.G. § 3E1.1(a), (b)
                      _____

TOTAL:                       17
```

A total offense level of 17 and a Criminal History Category of I result in an advisory Guidelines range of 24-30 months. The government recommends that the Court impose a low-end sentence of 24 months' incarceration.

**B.  If The Court Does Not Find Defendant Liable For The Conspiracy's Loss Amount, The Court Should Find Defendant Liable For The Total Loss Attributable To Her And Co-Defendant Mateer's Conduct.**

Even if this Court does not hold defendant responsible for the loss attributable to the full scheme after she joined the scheme, the Court should hold defendant liable for at least the losses attributable to the EDD cards used for withdrawals by her and co-

---

[defendant's] absence . . . . [and][defendant] continued to withdraw various sums of cash using the fraudulent accounts." (cleaned up)); United States v. Leslie, 658 F.3d 140 (2d Cir. 2011)("while arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must").

12

defendant Mateer after she joined the scheme. Defendant does not dispute - nor can she - that she and co-defendant Mateer worked together in the scheme to fraudulently obtain EDD benefits. Here, the losses for which defendant and co-defendant Mateer are responsible is $399,796.19.

Specifically, ATM surveillance shows defendant making 26 withdrawals and defendant and co-defendant Mateer together making 30 withdrawals.[5] (See Granger Decl., Ex. D.) Those withdrawals involved the use of 16 total EDD cards. The loss attributable to those 16 cards after the date that defendant joined the scheme is $399,796.19. (See Granger Decl. Ex. F, a spreadsheet detailing losses connected to the 16 cards.)

The loss attributable to the cards at issue in these 56 transactions after the date that defendant joined the scheme is clearly: (1) within the scope of the jointly undertaken criminal activity; (2) in furtherance of that criminal activity; and (3) reasonably foreseeable in connection with that criminal activity. See U.S.S.G. § 1B1.3(a)(1)(B). As such, the Court should find defendant liable for a loss amount no less than $399,796.19.

Defendant knew that each of these 16 EDD cards was a part of the scheme because she was personally present when each of them was used. She knew that they would be re-loaded and that additional withdrawals would be made. That was the purpose of the EDD fraud scheme. Even if the Court were to apply this lower loss of $399,796.19 attributable to the EDD cards actually used by defendant and co-defendant Mateer, the government believes the same total offense

---

[5] Defendant's 26 withdrawals totaled $25,740 and defendant and co-defendant Mateer's 30 withdrawals totaled $29,000.

level of 17 would apply, resulting in an advisory Guidelines range of 24-30 months.

### C. Defendant's Proposed Loss Amount Is Underinclusive And Contrary To The Law.

As discussed, defendant believes the appropriate loss amount is $54,740. Thus, under defendant's calculation, defendant's total offense level calculation is as follows:

| | | | |
|---|---|---|---|
| Base Offense Level: | 6 | | U.S.S.G. § 2B1.1(a)(2) |
| Loss of more than $40,000: | +6 | | U.S.S.G. § 2B1.1(b)(1)(D) |
| Offense involved 10 or more victims | +2 | | U.S.S.G. § 2B1.1(b)(2)(A) |
| Acceptance of Responsibility: | -2 | | U.S.S.G. § 3E1.1(a) |
| TOTAL: | 12 | | |

Defendant arrives at this loss amount by only holding herself accountable for the amount where ATM video surveillance captures her personally making a withdrawal. Specifically, ATM surveillance video shows defendant in approximately 26 transactions making withdrawals that total $25,740. Additionally, ATM surveillance video reveals both co-defendant Mateer and defendant together on for approximately 30 transactions totaling $29,000 in withdrawals. Thus, defendant has added the values of the transactions only for those transactions where she was: (1) physically present; and (2) where her presence was captured on ATM surveillance video.

But defendant's loss calculation is underinclusive and contrary to the law and Sentencing Guidelines. Defendant's calculation fails to consider any conduct by co-conspirators outside the presence of

14

defendant, or include any conduct by defendant or her co-conspirators that was not captured on ATM surveillance. The Court should disregard defendant's requested loss calculation.

## V. A TWO-LEVEL ENHANCEMENT IS APPLICABLE BECAUSE THE OFFENSE INVOLVED TEN OR MORE VICTIMS.

U.S.S.G. § 2B1.1(b)(2)(A) applies a two-level enhancement if the offense at issue involved ten or more victims. The parties agree that this two-level enhancement applies to defendant's conduct. (Plea Agreement ¶ 13.) As an initial matter, when defendant and co-defendant Mateer were stopped on October 1, 2020 for a traffic violation, there were, among other items, two cell phones with debit and credit cards in names belonging to 13 persons other than defendant or co-defendant Mateer, 17 EDD cards embossed with names of 17 persons other than defendant and co-defendant Mateer, and five credit and debit cards in names other than defendant or co-defendant Mateer. (PSR ¶ 8; Plea Agreement ¶ 11.) Moreover, the transactions for which defendant and co-defendant Mateer are captured on ATM surveillance involved the use of 16 EDD cards embossed with names of 16 persons other than defendant and co-defendant Mateer. (See Granger Decl., Ex. F.) And finally, the full loss amount of $478,280.69 involved the use of 26 EDD cards embossed with names belonging to 26 persons other than defendant and co-defendant Mateer. (See Granger Decl., Ex. E.)

## VI. THE GOVERNMENT RECOMMENDEDS A LOW-END GUIDELINES SENTENCE OF 24 MONTHS' IMPRISONMENT.

Consistent with its obligations in the plea agreement, the government recommends that the defendant be sentenced to a low-end term of 24 months' imprisonment, followed by a three-year period of

15

supervised release, a $100 special assessment, and restitution of $478,280.69 or $399,796.19, consistent with the loss amount applied by the Court. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a)

### A. The Nature And Circumstances Of The Offense And History And Characteristics Of Defendant Warrant A Low-End Guidelines Sentence.

The nature and circumstances of defendant's offense support a low-end Guidelines sentence of 24 months' imprisonment. 18 U.S.C. § 3553(a)(1).

Defense counsel has raised several mitigating circumstances to the government's attention. First, defendant had a difficult childhood, enduring a sexual abuse at age thirteen. She used drugs to cope with the abuse, beginning with marijuana at age 13, and escalating to cocaine the following year. She also suffered from obsessive compulsive disorder and Tourette Syndrome as a child, which have now become dormant. She became homeless at age seventeen, and continued to struggle with substance abuse, including methamphetamine. At the time of the instant offense, defendant was addicted to drugs and living with her co-defendant, who pleaded guilty to possession with intent to distribute methamphetamine, which may have contributed to her decision to engage in the crimes to which she has pleaded guilty. Defendant has recognized her addiction and represents that she is working to overcome it.

A below-Guidelines sentence, however, is not appropriate in light of the seriousness of defendant's criminal conduct. Defendant unlawfully possessed multiple EDD cards and, along with her co-conspirators, withdrew hundreds of thousands of dollars in EDD

benefits from those cards.  On at least one occasion, defendant also attempted to obtain additional profiles to grow the EDD fraud scheme. (See Granger Decl., Ex. B.)

Thus, on balance, the nature and circumstances of the offense and defendant's history and characteristics support the government's recommended low-end Guidelines sentence.

### B. A Low-End Guidelines Sentence Reflects The Seriousness Of The Offense, Promotes Respect For The Law, Provides Just Punishment, Affords Adequate Deterrence, And Protects The Public.

The sentence must satisfy the need to punish defendant, as well as society's need to reflect the seriousness of the offense; promote respect for the law; provide just punishment; afford adequate deterrence; and protect the public.  18 U.S.C. § 3553(a)(2).  Here, the government's recommended sentence will provide deterrence both to defendant and to others who might otherwise be inclined to perpetrate a similar crime.  Moreover, because the Guidelines calculation reflects the fact the defendant committed the instant offense while on probation, a sentence within the Guidelines promotes respect for the law.

### C. A Low-End Guidelines Sentence Avoids Unwarranted Disparities.

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  One way of doing so is to correctly calculate the Guidelines range and then sentence defendants within that range.  See Treadwell, 593 F.3d at 1011 ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining

17

that there was no 'unwarranted disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."). Here, under the correctly calculated Guidelines range, other defendants "with similar records who have been found guilty of similar conduct" as defendant, can expect a prison sentence between 24 and 30 months' imprisonment. See U.S.S.G. § 5A (Sentencing Table). As such, the government's recommended sentence, which is at the low end of that range, avoids an unwarranted disparity with similarly situated defendants.

**VII. CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 24 months' imprisonment, three years' supervised release, a $100 special assessment, and restitution in the amount of $478,280.69.